[No. B116960. Second Dist., Div. Four. Mar. 1, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
NASSAR LAVAIE, Defendant and Appellant.

**COUNSEL**

David L. Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Sanjay T. Kumar, Peggy J. Bradford and Andrew D. Amerson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**EPSTEIN, J.**—Nassar Lavaie appeals from his conviction after a court trial for escape from a state prison camp facility. He claims the evidence is insufficient to prove that he left the camp. He also asks this court to find that intent to remain free of custody is an element of the crime of escape, and to find that appellant lacked such intent as a matter of law. Respondent asks this court to modify the judgment because the trial court failed to impose a parole revocation fine, as required by Penal Code[1] section 1202.45. We find insufficient evidence that appellant departed from the limits of his custody as required for escape, and therefore reverse the conviction.

### FACTUAL AND PROCEDURAL SUMMARY

Appellant was an inmate at Camp 19, a state correctional facility in Azusa Canyon. Sometime between 12:30 and 1:00 a.m. on May 25, 1997, Officers Ingram and Vargas counted the inmates at the camp, and all were present.

While patrolling the camp shortly after that count, the officers saw "what appeared to be two inmates walking towards the front gate." The men were outside the dormitory, but within the perimeter fence of the camp. Officer Ingram believed they were inmates because they were dressed in black sweat

---

[1]All statutory references are to the Penal Code unless otherwise noted.

clothing, which many of the inmates wear. The officers could not see whether the men left the camp. According to Officer Ingram, "From the position we first saw them, I couldn't see the front gate. They were going right towards the front gate. By the time I moved to observe the front gate, then they were unaccounted for, they were gone." The officers changed position to see the front gate, but did not see the men come back towards them.

The fence and front gate were made of chain link. The front gate was locked and chained. The officers did not hear any rattling of the chain link. Officer Ingram described what they did next: "We went to the front gate, searched around in the immediate area, opened the front gate and went outside. There's about a couple hundred yards from the camp to the road and we searched that whole area looking for the inmates."

When the officers did not find the two men, they closed the yard, sent everyone to bed, and did an "I.D. count" to determine if anyone was missing. They went from bed to bed, matching the inmates with their pictures to determine who was in each bed. Two men were missing, appellant Lavaie and Bradley Zook.

According to Officer Ingram, the only areas of the camp inmates are allowed to be in at 12:30 or 1:00 in the morning are the TV room and the dormitory. The officers conducted "a thorough, systematic search of the camp to make sure they weren't asleep in the T.V. room or in a hobby area or out of bounds in the kitchen or someplace else in the camp." They checked all the buildings, looked inside the vehicles parked on the site, and checked to see that the trailer used for conjugal visits was locked. Officer Ingram paged the missing inmates over the loudspeaker, telling them to report to the administration building. The loudspeaker system was working, as far as Officer Ingram could tell; he could hear the page as he made it. The inmates did not respond.

Officer Ingram called the sergeant and reported the men missing. He was instructed to begin the escape procedures. This included informing various law enforcement agencies that two inmates had escaped, printing and posting bulletins to that effect in local stores, and calling additional officers into the facility. Officer Ingram saw Zook about 3:00 a.m. He saw appellant at 3:15 a.m., walking down the steps from the kitchen and dormitory area. Appellant had not requested permission or authority to go into an out-of-bounds area that night.

Appellant was charged with escape from a state prison facility without force or violence, in violation of section 4530, subdivision (b). It was further

alleged that appellant had served a prior prison term and did not remain free of prison custody and a new felony offense within the meaning of section 667.5, subdivision (b). Trial was by the court. Appellant was found guilty as charged, and sentenced to the low term of 16 months, to be served consecutively to the term he was serving at the time of the escape. This is a timely appeal from the judgment of conviction.

## DISCUSSION

■ Appellant claims the evidence was insufficient as a matter of law to prove that he ever left the camp. Respondent argues it is not necessary that the prisoner leave the prison premises in order to effect an escape. Unfortunately, the escape statute provides little assistance in resolving this question.

Section 4530, subdivision (b) provides: "Every prisoner who commits an escape or attempts an escape . . . , without force or violence, is punishable by imprisonment in the state prison for 16 months, or two or three years to be served consecutively." During argument on appellant's motion to dismiss pursuant to section 1118, the court asked counsel to define escape. The prosecutor responded: "In the case of *People* v. *Temple* [(1962)] 203 Cal.App.2d 654 [21 Cal.Rptr. 633], unlawful departure of a prisoner from limits of his custody constitutes escape even though he does not leave prison. [¶] *People* v. *Jones* [(1958)] 163 Cal.App.2d 118 [329 P.2d 37] also reads: unlawful departure of a prisoner from limits of his custody constitutes escape. [¶] *People* v. *Owens* [(1965)] 236 Cal.App.2d 403 [46 Cal.Rptr. 91] states that a person who is in the custody of the Forestry Department or on a firefighting crew away from a prison camp or a prison, under the supervision of any authorized person, is in constructive custody of the Department of Corrections and prison officials for the purposes of this section."

Defense counsel argued that the admissible evidence was insufficient to establish that appellant was outside the confines of the facility during the time he was deemed to be missing. "The only thing we know at the trial is that he appears 45 minutes later coming from the dorm and kitchen, and that's it. There's no evidence produced that he had no right to be in the dorm or the kitchen. There's no evidence produced there would have been a criminal prosecution for escape had he been in the dorm or kitchen. [¶] The only reason we're sitting here is because he confessed. And that confession has been suppressed."

The prosecutor disagreed with defense counsel's analysis. "The only testimony on this record from the officer is that this defendant had bounds. Those bounds were the dormitory and the T.V. room. The testimony is that

he was in neither one of those rooms. He was clearly out of bounds. [¶] The fact that he was not or could not be proved to be outside the perimeter fence of the area is insignificant for the purpose of escape. [¶] The rationale for that is very clear. We can't have prisoners going off and hiding, putting into effect an entire procedure in the case there are escape[d] prisoners on the belief they may be hiding somewhere, someplace, sometime in this facility." The prosecutor concluded: "The statute is met. The defendant clearly was not in the dormitory or the T.V. room. Clearly those were the bounds, regardless of what counsel wants to say about anywhere else. That's the testimony here; it's unrefuted."

The court denied appellant's motion to dismiss and his motion for acquittal. The matter was submitted. Before deciding the case, the court explained: "You know, there's so many questions here. When you say it's a loose-knit operation, that they come and go as they please, 12:30 to 3:30 in the morning, I don't know if it's that loose of an operation. They have these rules, and it's true that two people searching an entire compound can't be every place at the same time, but they, from the facts that they saw these two people in black walking out towards the front gate, they went over to change their position to look to see what they were doing, lost track of them, they went on the loudspeaker, nothing happened, they searched the camp first, went on the loudspeaker, still no response. Then they started the procedure and some time after that the defendants started appearing at two different times about 15 minutes apart. [¶] I figure from the evidence that the defendant did know he may not have left the perimeter, so he's guilty of the crime of escape as described in the cases submitted by the district attorney."

While the court's statement is not entirely clear, it seems its determination that appellant committed an escape was based on the definition provided by the prosecutor: unlawful departure of a prisoner from the limits of his custody. It also seems that the court found that departure based on appellant's absence from the area where he was permitted to be, rather than from the camp itself. An examination of the cases cited by the prosecution and relied on by the trial court convinces us that this is too broad an interpretation of the crime of escape.

The first case cited by the prosecution was *People* v. *Temple* (1962) 203 Cal.App.2d 654 [21 Cal.Rptr. 633]. In *Temple*, the defendant argued that since he did not get entirely off the prison premises, he was not guilty of escape. The court rejected that argument: "Since the decision in *People* v. *Quijada* [(1921)] 53 Cal.App. 39 . . . it has been the settled law of this state that an escape is the unlawful departure of a prisoner from the limits of his custody. Here the defendant was restricted to a certain area of the prison at

Soledad. He had no permission to leave the area where he was confined; with others, and pursuant to a plan, he climbed the fence and fled several hundred yards across a field until halted by the fire of the guards. It is of no consequence that he had not completely escaped from the prison premises. The offense of escape was complete when defendant unlawfully departed from the limits of his custody with the intention[2] of escaping from the prison premises." (203 Cal.App.2d at p. 658, fn. added.)

*People* v. *Quijada* (1921) 53 Cal.App. 39 [199 P. 854], the case on which the *Temple* court relied, involved a prisoner who went through one prison gate and was outside the prison walls, but was recaptured while still on prison property. The court held: "When the defendant went beyond the prison walls without permission of the authorities he unlawfully departed from the limits of his custody, and it is immaterial that he did not get entirely beyond the territory connected with the prison grounds. It was his duty to remain within the walls as he very well knew, and when he transcended these limits he necessarily 'violated his lawful custody.'" (*Id.* at p. 41.) In both *Temple* and *Quijada*, the prisoner had gone beyond one barrier, either a wall or a fence, but had not left the outer limits of the prison property.

*People* v. *Jones* (1958) 163 Cal.App.2d 118 [329 P.2d 37], the second case cited by the prosecution, quotes *Quijada* for the definition of escape. The question in *Jones* was not whether the defendant had gone outside the limits of his custody—he had left the prison facility in Chino, and was recaptured in Oregon. The court in *Jones* was considering whether, when an inmate believed his commitment was invalid, his departure from custody would constitute an escape within the meaning of section 4530. The court held that it did. *Jones* is of no assistance.

The final case cited by the prosecution was *People* v. *Owens* (1965) 236 Cal.App.2d 403 [46 Cal.Rptr. 91]. In that case, the defendant was a prisoner assigned to a fire-fighting crew. He left the fire lines without permission, and was apprehended three months later. This case is not helpful in ascertaining the extent of the departure needed to commit an escape.

We have found no cases recognizing an escape when a prisoner remains within the camp or prison barriers, but is outside the particular area within the camp or prison where he is permitted to be. The evidence in this case, even when viewed in the light most favorable to the judgment, establishes only that much, and is hence insufficient.

This incident began about 12:30 p.m. when Officers Ingram and Vargas saw two men walking towards the front gate; the two men were inside the

---

[2]The question of intent needed for escape was not raised in *Temple*, and the court's mention of intent is hence not authority supporting its inclusion as an element of escape.

perimeter of the camp at that time. The officers' view was blocked by a trailer, and they did not see whether the men walked through the gate. The officers searched the area around the gate, both inside and outside the camp perimeter, but did not find the men. The officers came back into the camp, ordered the inmates to their beds, and did an "I.D. count." That was when they discovered that appellant and Zook were missing.

According to Officer Ingram, the only areas of the camp inmates are allowed to be in at 12:30 or 1:00 in the morning are the TV room and the dormitory. He searched the dormitory and the TV room, and appellant was not in either place. He conducted a "thorough, systematic search of the camp" for appellant and Zook. Officer Ingram placed Officer Vargas at the front gate, while he undertook the search of the 10-acre camp. His search lasted approximately 30 minutes. Officer Ingram admitted that he did not check the roofs or the attics or the trees, or the perimeters of the fence. He agreed it was possible that when he was looking in one room for the missing inmates, they could have been in a different room, and that even if an inmate was on the camp grounds, it was possible that he might not see the inmate. Officer Ingram acknowledged that the missing inmates could have been in the facility, or outside the facility.

While this evidence may be sufficient to show that appellant violated prison rules, it is insufficient to support a conviction for escape. In light of this conclusion, we do not address the remaining claims by appellant or respondent.

DISPOSITION

The judgment is reversed.

Vogel (C. S.), P. J., and Hastings, J., concurred.

Respondent's petition for review by the Supreme Court was denied June 16, 1999. Baxter, J., was of the opinion that the petition should be granted.